2014-1564 Alexam v. Gap Thank you, Your Honor. Good morning. May it please the Court. The patents in this suit are invalid for two reasons. One, 35 U.S.C. 102G, and the second, 35 U.S.C. 101. I will address anticipation first. At trial, it was deduced that the key piece of prior art in this case, what is known as the Kmart system, contains all of the references or all of the teachings of the claims in suit. This was agreed to by both experts. It was also deduced at trial that the critical date for this teaching was May of 1997, roughly two months before the filing of the patents in suit. Therefore, for these patents in suit to remain valid, the inventor must move his conception date or his reduction to practice date back behind May of 1997. That effort was undertaken at trial. The inventor, through his attorney, provided nearly 20 shards of evidence, cobbled together, to try to move those dates back. Yet, every one of those pieces of evidence, whether taken separately, I'm sorry, sir. You're moving, I mean, look to me like this. You're talking about the way the case was tried on this issue, about whether or not there was prior invention by Dorff. And the step that I think you missed was you talked about Kmart, and Kmart has a May 1997 date, and it's conceded that Kmart has all the limitations and the assertive claims. But in order to be an anticipatory reference, it has to be enabled, right? Correct, Your Honor. And what was the evidence of enablement? The enablement was the actual testing that's also put in the blue brief, Your Honor. We see that there was testimony first at trial by Mr. Mike Hastie, the engineer from Stuart Value who worked on this system. He also talked about the activity undertaken at an actual Kmart store. They developed the construct, and then he talked about the first effort to put this in place at Kmart, up in the store in Michigan. My understanding was that that testing was challenged by your adversary as being in the insufficient to show enablement because it was an experimental use. That's a misplaced view by our adversary, Your Honor, based on the court's jurisprudence. Am I right that that was the counter to your presentation of the testing in the store at Kmart was that the adversary said, no, that's irrelevant because that doesn't show a reduction to practice because it was not embedded? That is their position, Your Honor. Of course, that position is inconsistent with this court's jurisprudence in Atlanta Attachment, which specifically identifies that for something to be enabled like this, it must work for its intended purpose, which was, in fact, demonstrated at the actual Kmart store using actual Kmart registers and point-of-sale devices using an actual Kmart gift card with actual Kmart computers and a network. How do you know it used an actual Kmart gift card? Nobody from Kmart testified at all about the May 97 runs, the pilot runs. So how do you know it used a gift card? The only person you had is somebody from SBS who testified on what they saw on their end. And while you're answering that, also point-of-sale devices. I'm sorry, Your Honor. Also point-of-sale devices. You said actual Kmart point-of-sale devices, and I'd like to know where that is too. Sure, Your Honors. You're correct that there was no testimony, Your Honor, from anybody at Kmart. The testimony was given by the engineer who put the system together for Kmart and worked in a Kmart store. Are you talking about, what was his name? Mr. Hastie, Your Honor. Mr. Hastie, but he admitted that he wasn't even employed by SBS at the time of May 9. Am I misremembering? I'm talking about the SBA. Oh, Mr. Willis is who I was thinking of. Mr. Willis? Correct, Your Honor. Okay, I'm sorry. You're talking about somebody else? That's correct. Mr. Mike Hastie was the engineer responsible for putting this together for Kmart. It responds to a Kmart RFP or a particular set of activities defined and delimited for Kmart. Kmart was one of the earliest users of gift cards. Kmart's system is generally consistent. Where did he testify or present evidence that in May of 1997, actual cards were used and swiped? His testimony is that he swiped a card that was swiped in a Kmart store that ran through the point-of-sale devices. That's August of 1997, isn't it? I think you're mixing your dates. I mean, show me where in the record. It was May. He said it was May of 1997. May of 1997, Your Honor. May of 1997 is when this activity took place in an actual Kmart store. Is this Willis or Casey? Who's the person giving the testimony? Mr. Michael Hastie, Your Honor. Hastie. And where is that in the record? Give me a sight, okay? I couldn't find that. Nor could I, and I'd like to see it. Absolutely, Your Honor. Would you give me a moment? Sure. Thank you, sir. Mr. Willis testified. Now, who is Mr. Willis? Mr. Willis is a business development person inside of Stored Value. He works in the sales side and was involved in post-sales activity. He was asked whether he knew that the SVS system actually processed Kmart gift cards using point-of-sale activation. He said yes. That's in A1236. He had testimony on that as well. I thought Judge Moore's question was, was he employed at the time, but it was Mr. Hastie that was employed at the time. I want to know who could give testimony that would provide substantial evidence that a gift card was used. I don't know about you, Mr. Fish, but I actually have my credit card numbers all memorized, and every once in a while I forget to take them. And every one of these POS devices, including these, the record shows, allows you to type in, for example, the number of your credit card, and then it gets transmitted to a place like SVS or whatever else. You don't have to swipe the card. You could use the keypad to key in the number as an alternative. Or you could even run software if all you're doing is testing the back-end receipt of information and processing of it. And so when I was looking at Mr. Willis's testimony, I was concerned because he's only an SVS employee. He only sees the back-end. He never went into a Kmart store. He wasn't even employed in May of 97 by these organizations. And he says later on in the testimony, after what Judge Clevenger referred to, he says, well, I don't know, I wasn't there, yada, yada, yada. So I'm kind of wondering where precisely is proof. You started your argument. You opened my brain to think about this because you said there's testimony that in May of 97 they used a card, they used a POS device, et cetera, et cetera. So it's a big record. It might well be in here. I just hope so. It is a big record, Your Honor. Just handed to me by my colleague is a citation in the Appendix A1267. This is the testimony of Mr. Hastie. Who again is Mr. Hastie? Mr. Hastie. Again, Your Honor, Mr. Hastie is the. 1267? No, we don't have that. We don't have that. You didn't give us that in the JA. You gave us 1260, 1290. Is it 1267? Correct, Your Honor. I've got that in my notes. Read it because we don't have that in our. It's not in the appendix. I believe there was a supplemental filing made when it was. Oh, I have a supplemental appendix. Is it in there? Yep, it's in here. 1267. If you don't have yours, you can share mine. All right, I got it. What's Mr. Hastie saying? Well, you've highlighted it. It doesn't say anything about point-of-sale devices and cards. But 1267, we're looking at it. 1269, Your Honor, the testimony of Mr. Hastie continues. Question, Mr. Hastie, what type of gift card transactions are shown here on this page? There's redemptions, point-of-sale activations, indicating a point-of-sale device. Under that last column to the right under the code, the four is redemptions and the seven is POS, point-of-sale activations. Hang on a second. What's he referring to? Is he referring to those pilot charts that look like a little table with all the information? Yes, Your Honor. That transaction record. Is that going to be at 851 in the record? These are the May dates. Yes, Your Honor. Let me reach for those as well. Those are the May dates. And the May dates show, with the same card, 4889 being the last four digits. One, two, three, four, five, six transactions. That's correct, Your Honor. Same card. What appendix are you in? I'm in. Okay. Okay. And one of them, there's 20 seconds apart. The other one, there's enough time to type it in. There's probably enough time, 20 seconds to type it in. Correct, Your Honor. So what the panel is asking is whether or not there is evidence in the record that is such that a jury would have had to believe it that the point-of-sale devices and the cards were used in May at Kmart. Well, two pieces to that, Your Honor. The first is Mr. Hastie's testimony, as we've just discussed. The second is that both experts agree. Mr. Hastie, you admit that he doesn't know anything about cards. He says point-of-sale activation. And point-of-sale devices, Your Honor. The law is that the reference has to be enabled, not that the invention has to be reduced to practice. Correct. And reduced and enabled means such that a person of ordinary skill in the art could make and use the invention, right? Correct, Your Honor. I suppose your argument would be that what we have here by way of testimony shows that one of ordinary skill in the art would have known how to run a card through a point-of-sale machine. At minimum, Your Honor. At minimum. I would, again, contend that the Atlanta Attachments case makes this abundantly clear that it works for its intended purpose, and we can see that here through these transaction records. As I've indicated, there's no dispute between the experts that all of the elements of the patents in suit are taught in this Kmart system, which would then imply all of these different pieces that we've been talking about. So at the bottom of 1267, he talks about the gift. The clerks know what they're doing with the gift cards, and then he talks about how he does it. So that's where you get your gift cards in. Correct, Your Honor. And this point then materializes what evidence do the patent holders have to swear behind this reference? And the answer is none. None of these 20 pieces of evidence they have identify two key components of the patent claims. The first key component that it does not describe is the transmission of an activation amount. That's not found anywhere in any of the 20 references. Let's back up just with the point-of-sale device and the swiping of the card, for example. I didn't see anything in the record that suggested that that particular issue was a bone of contention between the parties as to whether or not the Kmart system was enabled or ready for its intended purpose. When I looked at your J-Mall motions, where you're filing a J-Mall upset, what you want to do and what they want to do is fighting over whether or not there was prior invention by Mr. Dorff. What does it mean? Did the jury hear testimony from both sides as to whether or not at Kmart they were actually using physical cards and using a point-of-sale device? The jury heard testimony of two types, Your Honor. The first type was from Mr. Hastie, as we've talked about. Also, well, I'll just say two types. One from fact witnesses, the SBS witnesses, Mr. Hastie and Mr. Wills. They also heard testimony from the expert witness, Mr. Reif, who, again, agreed, who agrees with the plaintiff's expert that the teachings of the Kmart system are sufficient to meet every element of the claimed invention. We have those transaction records which demonstrate that the system, at minimum, was conceived, certainly enabled, certainly reduced to practice because it was operating in the store at that moment in time. Those eight transaction records teach that. As the presiding judge pointed out, the transactions that I pointed you to on page A851, the six transactions using the same card, could have been someone that was entering the card numbers manually instead of swiping a card. Your Honors, I see that my time is dwindling to a very small number. May I address one other remaining issue before my time expires? Sure. Go ahead, Mr. Kessler. Thank you very much. I would like to address 35 U.S.C. 101. As this Court knows, Mr. Dorff's patents have been before this panel multiple times before. Wrong choice. I'm sorry? Wrong choice, on my part, to let you go ahead. That's a dumb argument. You have so waived this. Bob Mayer told you years ago, raise it. Did you raise it at that point? Nope, didn't raise it at that point. Your Honor, do you not believe— You raised it until now. You don't believe— What stopped you from doing it all along? The Dynatech case, Your Honor, you don't believe has significance here? There are five different factors that allow this, but I don't believe that it's been waived at all. And very pointedly, Your Honor, when this decision was made in the IDT case, that set the law of this Court that the lower court had to follow, and that law was that this patent, the 608 in particular, passed the muster for appropriate subject matter. I'm simply asking the Court to revisit that in light of the Alice decision. That's what I'm asking this Court to do. We were bound by that, Your Honor. But District Court wasn't going to independently rule after this Court had approached this issue in the IDT case. But you didn't ask them to, so you didn't preserve the issue, right? You knew Alice was in play. It's been in play for so many years. You didn't ask him to. You didn't preserve it, yet you knew the issue was up for grab. Your Honor, then I point this Court to the Dynatech case. We just don't do this as a matter of law on appeal. All right, Your Honor. I will reserve the brief time I have left. Don't worry. I'll restore your rebuttal time. We asked you a million questions on the record and everything else, so you get all your rebuttal time back. That's fine. Let's hear from – is it Mr. Segress? Yes, Your Honor. Okay. Thank you, Your Honor. Good morning, Your Honor. Philip Segress representing the appellee. Mr. Segress, I saw you sitting down there shaking your head, which you shouldn't do. Do you disagree? Do you dispute that those six transactions occurred on 9 May? Something happened on 9 May. All right. But I disagree that the jury was compelled. Let me then ask you. Do you dispute that those – because I think you're going to answer another way – transactions included both point-of-sale gift card activities and purchase transactions? I don't know what all they included. What I disagree with is that the jury was compelled to find that those transactions from a report dated in August showed irrevocably that there had been a reduction to practice in May. And Judge Clevenger, you asked earlier – we're talking about an enablement here, not a reduction to practice. This is a 102G question. We're talking about a reduction to practice. They have to show an actual reduction to practice. And all I've got are these six transactions that are showing up in a report in August, which is after the filing date of the patent.  I mean, the transactions were run in May. Nobody disputes that. You don't dispute that they were run in May. Something happened in May. Some sort of testing happened in May. They were still testing their system in May, in June, in July. It was experimental? Yes. And that's your main thrust of your argument is it was experimental, not real? I don't know about not real, but it was definitely such that the jury could have concluded from the testimony that they were given that Kmart was still testing this to see if it would work. And they tested it for several months. Reasonable for them to test it for that long period of time. What is the evidence they were testing it to see if it would work as opposed to – as the testimony actually that Mr. Fish pointed to quite adeptly, given this record, that they were testing it to make sure the Kmart clerk knew how to work the system? That's the testimony of the record at 1267, which he pointed us right to. What is the testimony that they were testing it to determine whether it was workable as opposed to testing it to teach their employees how to use it? Because it's not – this is not training in all of the stores. This is a test in a few pilot stores. It can't be training all of the clerks. They're training these particular clerks to use it. That's the testimony. So what he says is that you don't roll it out. You don't roll out a new gift card system before you've actually run a few test transactions or actually piloted it in your stores. Pilot it in the stores. Right. Piloting is having a lead store. Is that not correct? Not necessarily the way he was using the term. Because he says he doesn't know if there were ever any gift cards, if there were ever any customers. He says he doesn't know if it was done. He agreed that it was internal testing. And his testimony on that is – it's shortly after this, but unfortunately it's in a different volume because it's not in the supplement. It's in A1305, which is volume two of the joint appendix. I didn't see you argue anywhere to us or otherwise that the Kmart system in May of 1997 didn't have all of the components. In fact, I kind of quite frankly thought that you accepted that it did, that there was no dispute between the system as used in May of 1997 and the system as rolled out and used in August of 1997. I thought I understood your argument to be, however, the May 1997 use was nonetheless experimental. But did you argue somewhere that there were elements of the May 1997 system – the elements of the claim that were not present in the May 1997 test? No, Your Honor. We're not arguing that. I am saying that we don't know. I want to make sure I understand the scope of the argument. Right. I am saying we don't know what all was in the May 1997 test. Actually, I think that most of your own testimony seems to indicate that everyone assumes that it's the identical system in May of 1997 and August of 1997. And I don't see you argue anywhere to the jury, nor do I see any testimony indicating that it might not have been. I don't think that could be a basis for the jury to conclude in your favor. It wasn't argued to them, and I don't see any testimony that supports that idea. Let me refer you to A1302 in the record, in Volume 2. 1302? Volume which one? This is Volume 2. 1302? Yes, Your Honor. And whose testimony is this? This is the same witness's testimony. This is right after the part that was missed. This is Willis? Willis? Willis. Hastie, I believe. I think this is Willis. It may be. Yes, this is Willis. Oh, it's Willis. Okay. You're correct. No, this is Hastie. 1302, Hastie. 1302. 1302? 1302. 1302, Your Honor. Yes, Mr. Hastie. Page 1299 says, Good afternoon, Mr. Hastie. They were pilot transactions. They were used to prove out the system. Yes. That's where he's saying these were done to see if it would work. They're used to prove out the system. Are these net sales to customers? Well, I don't know if they are or not. It could have been employees. He just doesn't know. Over on page 1304. Right, but he's not saying that they aren't using cards or using a point of sale device. He's not saying that they aren't. But it's their burden to prove by clear and convincing evidence that there was an actual reduction to practice, and they weren't just testing it still, in May of 97. A jury listening to this, listening to this witness say, Well, I'm not sure. It could have been. Over on page 1305. Asked about internal testing. He said, Yes, it's internal testing. Can I ask a question? Yes, Your Honor. We are reviewing, I believe, the district court judge's denial of GAP's JAMAL. Yes, Your Honor. On anticipation. Are we constrained by the shape of the JAMAL argument that was made to the district court? I got the JAMAL motions, and I read them. Yes, Your Honor. I saw what the motion was, and I saw the basis for their motion. The basis of their motion essentially was that your client couldn't prove prior invention, that he could corroborate, nor could he show diligence, pardon me, prior conception and diligence. That was their reason for saying why they weren't there. They started off by saying it's conceded that KMAR anticipates. They were assuming that there was a sufficient reduction of practice. Your response doesn't take issue with their primary issue. Your defense of the jury verdict in your JAMAL motion deals only with your inventor's prior invention. Your Honor, Paul has agreed that the KMAR system has all the elements. As a matter of procedure, if I'm reviewing the denial of the JAMAL, do I simply look at what you all said was the reason for sustaining the jury verdict yes or no at that point in time, or do I go back and look at the whole jury trial? Your Honor, I believe you're not constrained to the argument that was made in response. I think if the jury verdict can be supported by any finding, then the jury verdict was correct. And if we didn't make an argument that supported the jury verdict, but it's still there, then the jury verdict should be affirmed. That's an additional basis. Maybe it was argued a little. Maybe it wasn't. But that's an additional basis for affirming the jury verdict. Well, let's say you made an active concession in the argument. That is – Let's not say that. I don't think that we did. Speaking hypothetically, if your opposing counsel said we assume that they accept that it was reduced to practice, and you said yes, we agree with that, but we disagree on this, we wouldn't be able to look at it, would we? Your Honor, hypothetically, that didn't happen. But hypothetically, if there was something amounting to a stipulation about reduction to practice, then I think it would be problematic for us to argue on appeal if there wasn't a reduction to practice. That didn't happen. During cross-examination of Mr. Hastings – But you're saying anything that supports the jury verdict is fair game. Because there wasn't such a stipulation. So it's clear that anything that supports the jury verdict isn't quite fair game. Hypothetically, in a different case, if there was stipulation, then yes, Your Honor, there might be something that could be taken off the table. But here, there was cross-examination about the nature of the testing that was done. And he was asked, now isn't this just internal testing? You don't know that these are customers. You didn't do any actual transactions. All of that is in the cross-examination. All of that is challenging the reduction to practice. The court, in ruling on the JMOL motion, said that one basis on which the jury could have found in favor of Elexam is that SVS did not reduce the Kmart system to practice before the Elexam system was reduced to practice. So that's a sufficient basis. That's something the jury could have found on this record, that they did not get a reduction to practice before Elexam did. And if the jury could have found that on this record, it must be presumed that they did find that on this record. Let's see, I'm down to about 10 seconds on my testimony. You're actually over by 10 seconds. Oh, just very briefly, our cross-appeal is on infringement. Infringement was tried to a separate jury. Our argument on that later in the brief is that there are no issues that the jury needed to resolve about the way the system worked. It's just a question of whether the claims cover it. Thank you, Mr. Segrest. Thank you, Your Honor. Mr. Fish, I'll give you four minutes for rebuttal time. Thank you, Your Honors. If I may turn us to A1302, please. Is that in the supplemental or the regular one? That's in the regular. That's in Volume 2, Your Honor. All right, well. Okay, we're pilot transactions. Mr. Hastie's testimony here. 1302. All right, got it. Those were not sales of Kmart gift cards to consumers. Line 19, please. Were they? I don't know if they were or not. They were people in the stores buying them. It could have been employees. It could have been somebody who asked for them. I don't think they were telling people about it. But I think if somebody asked to use it, they would give it to them. The it are the cards. And the buying is the key. That's part of it, that there's somebody in there. This has really been glossed over by continuing to define these early, quote, tests as tests. They're pilot programs in a deployment. And as Mr. Hastie testifies. Okay, so he claims this is a 102G. Why isn't this a 102B? I mean, what, so what, is it not a year before? Maybe that's why. I don't know. Why isn't this a 102A public use? What is the nature of it? Because Judge Clevenger began here. Are we talking about enablement? Are we talking about reduction of practice? And your proponent said, no, this is purely 102G who invented it first. It's the prior use, Your Honor. It's the independent prior use in advance. And they need to move this date back. That's why it's the 102G. And that's why the fight has been, historically, as Judge Clevenger identified, it's really been about, can they move the date back? And so your argument in response to him would be, they're not experimenting. They're selling them. Well, indeed. It's talked about a pilot program. And Mr. Hastie's testimony here continues to say, Kmart is not going to roll out something like this to all of its stores until it can be figured out. We're thinking about gift cards in today's model. It's generally regarded that Kmart was the second company in the United States to have gift cards as we know them. The first was mobile oil. This was a brand-new concept in its day. And so as we overlay our thinking about these ideas onto them, we're presupposing this knowledge that we all have today about how they operate and that they operate efficiently. The fact of the matter is that it takes a lot of activity to make sure these work. And that's what's being tested. And I don't blame Kmart, I don't think any of us would, for being commercially wise to run a pilot program. Mr. Hastie testifies specifically to this issue. This effort to continue to cloud this as something other than a pilot program, something as remote as testing in a laboratory, which this is not. This is in a store with real terminals. And with real money, which is important. So we have this as Mr. Hastie's testimony. The testimony continues, but his testimony becomes key to this issue, obviously. With this understood, none of the pieces of data, none of the evidence that's produced by Mr. Dorff, teaches two of the key elements in the claims in suit. Those two key elements that aren't taught by any of these 20 pieces, in part or in whole, are the idea of transmitting and activation amount. That's a requirement of every claim of both patents. It's not in there anywhere. And the 608 patent places an additional requirement on the claim language. And that is that the POS terminals, the point of sale terminals, be unmodified, unchanged. And that's significant because the goal here of the patents was to be able to take advantage of unmodified terminals. Yet, there's nothing in any of these 20 pieces of information, taken as whole, or in part, or an individual piece, that teaches or suggests anything about unmodified point of sale terminals. The absence of those pieces do not permit Mr. Dorff to swear behind this reference. The Coleman jurisprudence of this court teaches us that. A case from 1995 cited over 30 times by this court, and 125 times in total. That is bedrock principle here. He's got to have every element. He doesn't. Therefore, Your Honors, he can't swear behind this date. As we've established, the Kmart system predates the patents in suit. And as a result, the patents in suit are invalid. My time has 30... No, you're over. Over. Oh, that's correct, Your Honor. Thank you for the indulgence. Yep, and since he didn't address infringement, I don't think that there's any opportunity for rebuttal on the cross appeal. That was my sense, though, Your Honor. If necessary, I will identify to the court that the jury verdict is supported by substantial evidence. Okay, now that you've addressed it, would you like to respond to whether it's supported by substantial evidence or not? Yes, Your Honor. Your Honor, it's not supported by substantial evidence because there's no dispute about the way the system operates. The question then is whether there's anything that's not met. And we laid out in detail in the briefs why it's not met, and I just want to summarize those elements, why the evidence was inadequate. The first thing that they suggested, well, maybe it doesn't have the activation that's required. Claims say that activation means crediting an amount to the card. There's some other activity called activation about flipping a switch. Maybe it doesn't do that, but that's not what's in the claims. And it's undisputed that it does what's in the claims about activation. The next one was a bank processing hub computer. It's undisputed that it has this machine. The question was whether it's maintained by a bank. The way that arose is that originally defendants argued, oh, a bank processing hub computer has to be located physically within a bank. The court said, no, it just has to get the information from a bank to allow transactions to be distributed over a banking network. So that's the type of maintenance that has to happen. It's undisputed that the computers here that GAP used get the information from banks to allow everything to be routed over a banking network. Next issue with the banking network itself, they said that because somewhere there's a dedicated connection from the bank processing hub computer back to SVS, that takes it outside the claims, but it doesn't. Banking networks include dedicated processing, dedicated connections. There's nothing in the claim that excludes a dedicated connection. An example in the patent list, a dedicated connection. And it's undisputed that other parts of the banking network, between the point of sale device and the bank processing hub computer, that these transactions flow over as part of the banking network. The last issue raised was one of control and the fact that there is SVS that owns the computers on the back end. But that's a red herring because it's undisputed that GAP uses those computers at SVS. It is the GAP employees who initiate the transactions. SVS is contractually obligated to do what it does on those transactions. And what SVS is contractually obligated to do meets every limitation of the claims. So that's why there's not substantial evidence to support infringement. Okay, case is taken under submission.  Thank you, Your Honor. All rise. The Honorable Court is adjourned until tomorrow morning at 10 o'clock a.m.